UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, Plaintiff, | **2:22-CV-11916-TGB-KGA** |
| vs. | **ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** (**ECF NO. 8**) |
| **HERMAN E. SIMMONS, et al.**, Defendants. | |

This is a civil enforcement action brought by the United States against Defendants Herman E. Simmons, Richmond Simmons, and Profile Income Tax Co., d/b/a Simmons Income Tax Co. The Government seeks to enjoin Defendants from preparing federal income taxes because of their alleged record of tax code violations.

On January 17, 2023, the United States filed a motion for a temporary restraining order ("TRO") and preliminary injunction against Defendants. ECF No. 8. The Government alleges that Defendants willfully and recklessly understated their clients' tax liabilities in violation of 26 U.S.C. § 6694 and seeks a preliminary injunction under 26 U.S.C. § 7407 barring Defendants from acting as tax preparers.

After first considering the Government's TRO motion and permitting Defendants to respond and state their opposition, both in a

written submission and during a status conference, the Court issued an opinion granting the TRO on January 20, 2023. ECF No. 11. The Court later extended the TRO through the Court's resolution of the Government's preliminary injunction request. ECF No. 14. As such, Defendants have been temporarily enjoined from serving as tax preparers while the parties briefed and presented evidence on whether the Court should issue a preliminary injunction. The Government now asks that the Court preliminarily enjoin Defendants from acting as tax preparers through final resolution of this case. For the reasons below, the Government's motion for a preliminary injunction is **GRANTED**.

## I.   BACKGROUND

Defendants are federal tax return preparers who primarily service customers in the Detroit area and file an average of 2,142 individual federal income tax returns per year. Government's Motion for Preliminary Injunction, ECF No. 8-1, PageID.110. The Government alleges that Defendants have repeatedly filed fraudulent tax returns on behalf of customers who did not know that Defendants were claiming false exemptions or understating their customers' true tax liability. *Id.* at PageID.109, PageID.114.

The record shows that between 2014 and 2017, the Internal Revenue Service ("IRS") assessed due diligence penalties against Defendants ranging from $11,000–$34,860 for failing to properly substantiate and document their customers' entitlement to certain tax

credits. *Id.* at PageID.110–11. The IRS also audited 131 tax returns that Defendants prepared for the 2016 through 2020 tax years and found approximately $550,000 in total deficiencies. *Id.* at PageID.112–13. A tax "deficiency" occurs when the amount of taxes reported on a tax return differs from the IRS calculation of how much is owed. Before filing suit against Defendants, the IRS interviewed 77 customers, and confirmed that Defendants understated the true tax liability of over 90% of those customers. *Id.* at PageID.113.

The Government alleges that Defendants "relied on a few favorite schemes to reduce their customers' tax liability and/or increase the refunds they would be paid." *Id.* These tactics including reporting false or inflated itemized Schedule A deductions (for medical and dental expenses, charitable contributions, or "other taxes") and reporting Schedule C business losses from enterprises that did not exist. *Id.* at PageID.113–18. The IRS also found that "Defendants often combined multiple false itemized deductions on a single return, clearing the standard deduction threshold without any single overstated deduction attracting the attention of the IRS." *Id.* at PageID.114.

In support of its preliminary injunction request, the Government cited and attached twelve customer declarations indicating that Defendants' clients had "no idea" where Defendants got the figures for the purported deductions. *Id.* at PageID.114–17. Indeed, some customers explained that they never mentioned the deductions that Defendants

claimed on their behalf and did not provide any documentation to support any entitlement to such deductions. *Id.* Similarly, Defendants' customers attested that Defendants fabricated names for businesses that the customers never operated, and did not even ask customers whether they operated a business before claiming Schedule C deductions for nonexistent business losses on their behalf. *Id.* at PageID.118–19.

In response, Defendants claim that they "never made up false or incorrect information for tax returns they prepared" and relied solely "on the statements of their clients." Defendants' Opposition to Preliminary Injunction, ECF No. 16, PageID.510. To rebut the Government's allegations of falsified deductions, Defendants submitted copies of documentation they purportedly received from some clients that substantiated the deductions. *See, e.g.*, ECF No. 16-3, PageID.582; ECF No. 22-2, PageID.856. Defendants further claim that at least one client may have lied to the IRS and Defendants about her tax liability, thus undermining her credibility as a declarant supporting the Government's position. Defendants' Supplemental Brief, ECF No. 24, PageID.1384–85.

Defendants also contend that "any mistakes on the returns" are attributable to "Defendant Herman Simmons's failing mental condition[1] or poor procedures and record-keeping due to the COVID-19 pandemic."

---

[1] Defendants note that Defendant Herman Simmons has been diagnosed with dementia, and his son, Defendant Richmond Simmons seeks to prepare taxes "independent of" Herman. ECF No. 16, PageID.504–05.

4

ECF No. 16, PageID.510. Defendants claim that they have now taken "extraordinary measures to prevent the same errors from happening again, including reorganizing the structure of the business, improving intake forms, and implementing document retention policies." *Id.* at PageID.523–24. Moreover, Defendants concede that they "lacked knowledge of what expenses were deductible as itemized deductions," which resulted in "overstate[ments] on some of the returns they prepared." ECF No. 24, PageID.1376. But despite Defendants' admission that they "exhibit[ed] a severe misunderstanding of [certain tax code] terms" and "did not understand key tax concepts," they maintain that their conduct was not willful or fraudulent. *Id.* at PageID.1379, PageID.1382.

Defendants further urge the Court to consider traditional equitable principles even though the Government is seeking a statutory injunction. *See* ECF No. 16, PageID.511–12. While 26 U.S.C. § 7407 does not explicitly require any balancing of hardships or demonstration of irreparable harm, Defendants claim that if equitable principles apply, the Government cannot demonstrate that the equities weigh in its favor. *Id.* at PageID.514–16. Similarly, Defendants contend that the Court should not completely enjoin Defendants from serving as tax preparers, but should merely enjoin them from engaging in specific prohibited conduct. ECF No. 24, PageID.1385–86.

The Court held an evidentiary hearing on the Government's preliminary injunction motion on March 3, 2023. The Court received testimony from Defendant Richmond Simmons and Alonso Perkins, one of Defendants' employees. Following the hearing, the Court ordered the parties to submit supplemental briefs summarizing their positions in light of the evidence presented to the Court. The parties completed their briefing on March 10, 2023.

## II.   LEGAL STANDARD

Preliminary injunctions are issued to preserve the status quo until the Court decides the case on the merits. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). Because "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," the movant "is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The Court can also consider hearsay evidence to assess whether a preliminary injunction is warranted. *See Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 620–21 (S.D. Ohio 2006) (collecting district and circuit court cases relying on hearsay in deciding preliminary injunction motions).

Federal law authorizes specific forms of injunctive relief that the Government may seek against tax preparers who have engaged in misconduct. Under 26 U.S.C. § 7407, the Court can enjoin tax preparers

6

from engaging in specific misconduct if the Court finds that the preparer has "engaged in any conduct subject to penalty under [26 U.S.C. § 6694 (the tax code provision that prohibits understating clients' tax liabilities)]," and "injunctive relief is appropriate to prevent the recurrence of such conduct." 26 U.S.C. § 7407(b)(1)–(2). But if the Court determines that "a tax return preparer has continually or repeatedly engaged in" the relevant misconduct, "and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of [the Internal Revenue Code], the court may enjoin such person from acting as a tax return preparer." *Id.* § 7407(b)(2).

"The traditional requirements for equitable relief need not be satisfied for the issuance of an injunction pursuant to § 7407, because § 7407 expressly authorizes the issuance of an injunction." *United States v. Gray*, No. 07-42, 2007 WL 851873, at *2 (W.D. Mich. Mar. 19, 2007); *see also United States v. Gleason*, 432 F.3d 678, 682 (6th Cir. 2005) (explaining that because 26 U.S.C. § 7408 "expressly authorizes the issuance of an injunction" related to tax shelters and reportable transactions, "the traditional requirements for equitable relief need not be satisfied"); *CSX Transp., Inc. v. Tenn. State Bd. of Equalization*, 964 F.2d 548, 551 (6th Cir. 1992) (clarifying that where "Congress has expressly authorized the granting of injunctive relief[,] . . . traditional equitable criteria do not govern the issuance of preliminary injunctions"

7

under the relevant statute); *United States v. Stone*, No. 06-157, 2006 WL 2265436, at *1 (W.D. Mich. Aug. 7, 2006) ("[B]ecause section 7407 is explicit and complete, the Court need not resort to and examine the traditional factors required for equitable relief.").

But because a statutory injunction under § 7407 does not require satisfying the traditional equitable factor of showing "likelihood" of success on the merits, courts generally require the Government to show its entitlement to a preliminary injunction under § 7407 by a preponderance of the evidence. *See United States v. DeAngelo*, No. 03-25, 2003 WL 23676571, at *1 (C.D. Cal. June 26, 2003); *United States v. Ratfield*, No. 01-8816, 2004 WL 3174420, at *12 (S.D. Fla. Nov. 30, 2004); *Stone*, 2006 WL 2265436, at *3.

## III.   DISCUSSION

To obtain a preliminary injunction against Defendants under § 7407, the Government must establish that Defendants committed a predicate tax code violation under § 6694. If the Government demonstrates a predicate violation, the Court then determines whether to issue a broad injunction prohibiting Defendants from acting as tax preparers or a narrower injunction merely prohibiting Defendants from engaging in the kind of misconduct shown.

### A. Whether the Government Has Established a Predicate Violation of 26 U.S.C. § 6694

Section 6694 prohibits tax preparers[2] from understating their clients' tax liability in two main ways. First, the Government claims that Defendants violated § 6694(a) by reporting positions on liability that they knew or should have known were without substantial authority, and therefore "unreasonable." Second, the Government argues that Defendants violated § 6694(b) by filing tax returns that understated their clients' tax liabilities either willfully or with reckless disregard for IRS rules and regulations.

#### 1. The Government's Evidence of Violations of § 6694(a) and (b)

In support of its motion, the Government has submitted 12 tax returns and accompanying declarations from customers attesting that they did not provide the figures listed as deductions, did not know where those figures could have come from, and had never even discussed their entitlement to the claimed deductions with Defendants. ECF No. 8-1, PageID.114–16. Defendants' clients also stated that they were not asked for supporting documentation related to the claimed deductions or other issues, did not review the return before signing and filing it, and were merely told the refund amount. *Id.*; *see, e.g.*, William and Delores Wade

---

[2] Defendants concede that they are tax preparers as defined by 26 U.S.C. § 7701(a)(36), and are thus subject to liability under § 6694 if found to understate their clients' tax liabilities. Defendants' Interrogatory Responses, ECF No. 8-2, PageID.135.

Decl. (Sept. 7, 2021), ECF No. 8-6, PageID.224; Joanne Coles Decl. (Sept. 8, 2021), ECF No. 8-10, PageID.357.

Filing tax returns with falsified deductions plainly qualifies as acting in willful or reckless disregard of the tax code, and reporting falsified deductions constitutes an unreasonable position given that fabricated figures lack any basis in fact and cannot be validly supported. *See United States v. Gibson*, No. 08-14700, 2010 WL 1139340, at *3 (E.D. Mich. Mar. 24, 2010) (finding that a tax preparer violated § 6694 by preparing "false Schedule C losses, false itemized deductions, and false Schedule A deductions" to understate his customers' liabilities with "no realistic possibility of being sustained on the merits"); *United States v. Sperl*, No. 06-0175, 2008 WL 2699402, at *9 (M.D. Tenn. June 30, 2008) (finding that tax preparers violated § 6694 by "inflat[ing] deductions and expenses in an effort to secure larger refunds for taxpayers, even though Defendants knew the taxpayers were not entitled to such deductions and expenses"); *United States v. James*, No. 11-913, 2011 WL 1422894, at *7 (E.D. Pa. Apr. 12, 2011) (finding that a tax preparer "negligently or willfully understated tax liability" by "claim[ing] Schedule C expenses and Schedule A expenses and deductions that were erroneous, unrealistic or unreasonable").

While Defendants acknowledge that they made some unlawful understatements in the returns submitted by the Government, they claim to have taken "extraordinary measures to prevent the same errors

from happening again, including reorganizing the structure of the business, improving intake forms, and implementing document retention policies." ECF No. 16, PageID.523–24. Defendants filed copies of recent returns prepared by Defendant Richmond Simmons shortly before the Court issued the TRO on January 20, 2023, presumably to demonstrate that their practices have changed for the better. But as was pointed out during the evidentiary hearing, these returns contain some of the same problems as the returns from the 2016-2020 audit that forms the basis of the Government's preliminary injunction request. In fact, as discussed in detail below, Defendants' recent "substantiation" documents show indicia of fraud that bolster the Government's allegations of willful misconduct.

### a. Falsified or Inflated Schedule A Charitable Deductions

Defendants claim that the Government's evidence of false or inflated Schedule A charitable deductions merely establishes Defendants' failure to substantiate. ECF No. 24, PageID.1381. And Defendants emphasize that they "are not required to substantiate [charitable] contributions," making the Government's allegations immaterial. *Id.* But the record evidence demonstrates that Defendants engaged in a pattern of willfully claiming false or inflated deductions to understate their clients' liabilities and disregarding federal regulations.

The Government has identified numerous instances where Defendants falsified or inflated charitable gifts. ECF No. 23,

PageID.1360. For example, the Government obtained a declaration from Sandra and Carlton Goodall explaining that the $21,265 in cash and non-cash charitable gifts on their 2020 tax return was wholly inaccurate, as they "did not incur anywhere near the amount of . . . charitable contributions" that Defendant Richmond Simmons listed. Sandra and Carlton Goodall Decl. (Aug. 15, 2021), ECF No. 8-6, PageID.248, PageID.261. Defendants submitted the 2020 return filed on behalf of the Goodalls, but did not include any supporting documentation to justify the $21,265 charitable giving figure listed. Defendants' Exh. M, ECF No. 22-10.

Similarly, Defendant Richmond Simmons claimed $23,204 in cash and non-cash charitable gifts on Mohammed Moozab and Yasameen Yahya's 2020 tax return, a value that the couple says was highly inflated. Mohammed Moozab Decl. (Aug. 10, 2021), ECF No. 8-8, PageID.314, PageID.320. Moozab specifically noted that he "did not tell Mr. Simmons any amount of charitable contributions" he made. *Id.* at PageID.320. Defendants also submitted the 2020 return they filed for Moozab and Yahya, but did not attach any supporting documentation to justify the $23,204 in charitable contributions claimed on their return. Defendants' Exh. O, ECF No. 22-12.

Likewise, Defendant Richmond Simmons claimed $19,104 in cash and non-cash charitable gifts on Joanne Coles's 2020 tax return. In her declaration, Coles explained that she "gave at most $3,000 in cash

12

contributions" to her church, and provided Defendants with a receipt from her church substantiating the contribution. Joanne Coles Decl. (Sept. 8. 2021), ECF No. 8-1, PageID.351, PageID.358. As for non-cash gifts, Coles stated that she gave "three bags of clothing, shoes and boots" to charity, but did not obtain a receipt and did not provide any records for the value of the goods to Defendants. *Id.* at PageID.358. Instead of including approximately $3,000 in cash gifts to charity on Coles's Schedule A form, Defendant Richmond Simmons listed that Coles made $7,306 in charitable cash gifts. ECF No. 22-14, PageID.1307. And while Coles could not estimate the value of the "clothing, shoes and boots" she donated and did not provide Defendants with a receipt from her donations, Defendant Richmond Simmons indicated that Coles donated $11,798 in non-cash charitable gifts in the form of bedroom sets, clothes, shoes, boots, electronics, bikes, books, coats, and toys. *Id.* at PageID.1308.

The audited returns and declarations demonstrating falsified or inflated Schedule A charitable deductions show more than a lack of substantiation. Rather, this pattern suggests that Defendants willfully engaged in fraudulent conduct to understate their clients' tax liability.

### b. Fraudulent Patterns from Defendants' Form 8283 Filings

Defendants' Form 8283 filings also present troubling patterns. As the Government summarizes, in returns from the 2016-2020 tax years, Defendants repeatedly claimed that their clients donated non-cash gifts

to charities valued at over $5,000, necessitating the filing of a Form 8283 for such donations. In the examples highlighted by the Government, the "adjusted basis" values Defendants listed for various clients was approximately $7,000 in every donation, and the "fair market value" was only approximately $900 less than the adjusted basis value in every case. ECF No. 23, PageID.1364–66. But the IRS instructions on filling out the Form 8283 emphasize that the "fair market value" of used household items and clothing is "usually much lower than new," and should be approximated by how much these used items would sell for at a "consignment or thrift shop." ECF No. 23, PageID.1361.

While Defendants claim to have drastically overhauled their practices and corrected any issues from previous tax years, evidence presented at the hearing showed that Defendants' most recent returns—filed just days or hours before the Court issued the TRO on January 20, 2023—contain the exact same issues. In five of their most recent returns, Defendants claimed that their clients' "adjusted basis" for donations was approximately $7,000, and the "fair market value" of the donation was approximately $900 less than the adjusted basis value in every instance. *Id.* at PageID.1361–63.

Assuming that Defendants' clients actually represented to Defendants that they donated approximately $7,000 in items to charity (and in some cases, multiple donations worth roughly $7,000 within one to three months of each other, *see* ECF No. 23, PageID.1364–66), such a

14

high purported value of donations would cause a reasonable tax preparer to seek out additional information to verify the estimation. This is because, as discussed below, federal regulations impose a duty on Defendants not to blindly rely on such claims given the need to accurately fill out the Form 8283. But there is no evidence that Defendants ever received or requested substantiation from their clients. Instead, the evidence strongly suggests Defendants fraudulently claimed these non-cash deductions and fabricated the figures on the Form 8283, "represent[ing] in the returns that they had received appraisals of charitable donations that never existed." ECF No. 23, PageID.1367.

### c. Fraudulent "Substantiation" for Charitable Giving from 2022 Returns

At the evidentiary hearing, Defendants claimed that they lacked documentation to support the claimed deductions on returns during the 2016-2020 tax years because a flood in the summer of 2021 destroyed all their paper files. Somewhat inconsistently, however, Defendants submitted copies of some paper files from before the flood; meaning apparently, not all traces of physical files were lost from that period. *See, e.g.*, ECF No. 22-12, PageID.1243–47 (copy of handwritten and hand-signed forms filled out by Mohammed Moozab and Yasameen Yahya, dated February 2021); ECF No. 22-14, PageID.1334–38 (copy of handwritten and hand-signed forms filled out by Joanne Coles, dated March 2021). Yet Defendants had no files to support their claim that

15

their clients provided them with documents substantiating their entitlement to the charitable deductions claimed for 2016-2020 tax year filings. And as the Government notes, Defendants have not "directed the Court to any page from [files related to returns filed during the 2016-2020 tax years] to refute" any of the statements by customers contained in the declarations submitted by the United States. ECF No. 23, PageID.1352.

While Defendants have submitted documentation purportedly received from their clients in relation to several 2022 tax returns filed as recently as January 20, 2023, these documents also contain indicia of fraud, and contradict Defendants' insistence that they have changed their ways.

Even a cursory glance at these documents raises suspicions. For example, it defies all experience and probability that organizations as disparate as the Tabernacle Missionary Baptist Church in Southgate, MI; Bright Horizons, a nationwide daycare chain; Sacred Heart Church in Detroit, MI; and Shady Oak Baptist Church in Providence, NC would all issue remarkably similar receipts: using seemingly identical typeface; listing their addresses in the same style, omitting both commas and periods; adopting the same format to record dollar amounts without commas; and failing to include essential information such as issuer names, signatures, or dates of issuance. *See* ECF No. 22-3, PageID.884; ECF No. 22-4, PageID.989; ECF No. 22-5, PageID.935; ECF No. 22-6,

16

PageID.969. Similarly, two purported Salvation Army Donation Receipts that appear identical to each other do not have commas or periods in the address format, do not use commas to separate the list of donated goods, omit commas in the dollar amounts, and lack issuer names and signatures. ECF No. 22-4, PageID.899; ECF No. 22-6, PageID.971.

In one case, a "receipt" from the Hartford Memorial Baptist Church purportedly given to Defendants by customer Victoria Windham states that it is issued "Pursuant to Internal Revenue Code requirements for substantiation of charitable contributions." ECF No. 22-7, PageID.990. But like the others, this receipt also does not use commas or periods in the address format, omits commas in the dollar amount, and does not have a signature. Moreover, Windham's tax return was filed on January 16, 2023. ECF No. 22-7, PageID.975. Consequently, one would reasonably assume this receipt was generated and provided to the tax preparer well before the tax return was filed. But this receipt—submitted to the Court as proof supporting Windham's claimed charitable deductions—states on its face that it was "printed on" January 17, 2023, the day *after* the return was filed. Defendants could not have substantiated Windham's charitable giving with a receipt that postdates her tax return filing.

While the Government has not presented evidence of authenticated charitable giving receipts from these organizations to allow a side-by-side comparison, the documents themselves bear indicia suggesting they may

not be genuine. Instead of bolstering Defendants' claims that their practices have improved, these "substantiation" documents further undermine Defendants' credibility, providing additional support to draw an inference that Defendants have willfully and recklessly disregarded the tax code. *See United States v. Stinson*, 729 F. App'x 891, 896–97 (11th Cir. 2018) (affirming the district court's conclusion that "'badges of fraud' were abundant" in the defendant's returns where he "regularly created records showing he had complied with [earned income tax credit] due diligence and had requested the necessary documentation when, in fact, he had never requested any such information"); *United States v. Pugh*, 717 F. Supp. 2d 271, 292 (E.D.N.Y. 2010) (issuing preliminary injunction under § 7407 after concluding that the defendants had "reason to know that their activities are illegal and, in fact, have engaged in a course of conduct to conceal their fraud").

### d. "Other Taxes" as Schedule A Deductions

The Government also points to ten instances where Defendants itemized deductions for "other taxes," but their clients attested that they had no idea what that deduction was for or why they were entitled to it. ECF No. 8-1, PageID.114–15. The Government summarizes that "other taxes" are only properly deducted in rare situations, and plainly do not include deductions for state sales taxes, which is what Defendants claimed as "other taxes" deductions. ECF No. 23, PageID.1355, PageID.1357–58.

At the evidentiary hearing, Defendant Richmond Simmons admitted to wrongfully deducting state sales taxes as "other taxes," and noted in his declaration that he now understands what "other taxes" are appropriately deducted. Richmond Simmons Decl. (Feb. 3, 2023), ECF No. 16-1, PageID.531. But concerningly, in the most recent tax returns filed before the Court's TRO entered on January 20, 2023, Defendants still improperly deducted state sales taxes as "other taxes." ECF No. 23, PageID.1358.

And despite claiming that their clients were eligible to deduct "other taxes," Defendants failed to comply with requirements to explain the bases for the deductions. The Government notes that Defendants cryptically reported to the IRS that the basis for "other taxes" deductions was "other taxes." *Id.* at PageID.1356. But in documents submitted by Defendants entitled "Supporting Notes for Schedule A"—not filed with the IRS—Defendants indicated that "other taxes" deductions included state sales taxes. *Id.* at PageID.1358; *see also* ECF No. 22-8, PageID.1017 (example of Defendants' supporting notes for Schedule A deductions listing state sales taxes as "other taxes" and marking the document with "DO NOT MAIL"). The Court agrees that Defendants' opaque explanation to the IRS coupled with notes that they purposefully withheld "suggests that Defendants used the circular definition intentionally, to avoid IRS scrutiny." ECF No. 23, PageID.1359.

19

## 2. Defendants' Good Faith Reliance, Ignorance, and Credibility-Based Defenses to Liability Under § 6694

Defendants deny that they took unreasonable positions or recklessly understated their clients' tax liability. Instead, Defendants contend that they made honest mistakes in preparing some tax returns based on their ignorance of how to properly claim deductions. Relatedly, Defendants claim that IRS regulations permit them to rely solely on what clients tell them without further substantiating their clients' entitlement to deductions. ECF No. 24, PageID.1380. Defendants also argue that at least one of their clients who submitted a declaration for the Government lied to Defendants and the IRS to reduce her tax liability. These defenses are without merit.

### a. Good Faith Reliance Under 31 C.F.R. § 10.34(d)

First, Defendants' insistence that they merely relied on what their customers told them is not credible based on the evidence before the Court. In *United States v. Hargrove*, the court found the defendant's testimony that "she was merely performing data entry, plugging in numbers that her clients gave her, and that she had no reason to doubt the noncash charitable contribution figures provided by her clients" to be "unpersuasive" and "not credible." *United States v. Hargrove*, No. 16-503, 2017 WL 2198190, at *4 (W.D. Ky. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 3614390 (W.D. Ky. June 20, 2017). And like Defendants here, the *Hargrove* defendant also claimed that:

> [S]he has not engaged in any scheme to defraud the United States;
> that she has changed her ways or been more careful since learning
> that she was under investigation by the IRS; that, when
> interviewed by IRS agents, her clients may have lied in large
> numbers to protect themselves.

*Id.* at *5. But the court concluded that the defendant's "contradictory" testimony "with limited or no evidentiary support" further undermined her credibility. *Id.*

Similarly, in *United States v. Pope*, the defendants claimed that summary judgment was inappropriate because "they intend to dispute at trial many of the specific factual statements attributed to their clients," and the Government's reliance on "'canned' affidavits" was insufficient to meet its burden. No. 15-11224, 2017 WL 5971665, at *5 (E.D. Mich. Nov. 30, 2017). The defendants submitted "a handful of documents," including receipts of charitable donations contradicting their clients' affidavits, but did not create a genuine dispute of material fact because those documents were facially inadmissible. *Id.* at *5, *7. Because it was "undisputed that the taxpayers . . . never reviewed the substance of their returns before signing them, and that they never supplied any information or documents to substantiate numerous false or inflated deductions and credits stated on those forms," the court granted summary judgment in favor of the Government and issued a permanent injunction barring the defendants from serving as tax preparers. *Id.* at *6, *9.

Here, the Court concludes that Defendants contentions that they acted in good faith are not credible. Moreover, Defendants vastly

overstate the extent to which a tax preparer can "rely simply on what is told to him and does not need to meet the substantiation requirements himself." ECF No. 24, PageID.1380. While 31 C.F.R. § 10.34(d) "generally" permits tax preparers to "rely in good faith without verification upon information furnished by the client," the regulation contains a crucial caveat. Specifically, the tax preparer "may not, however, ignore the implications of information furnished to, or actually known by, the practitioner, and must make reasonable inquiries if the information as furnished appears to be incorrect, inconsistent with an important fact or another factual assumption, or incomplete." 31 C.F.R. § 10.34(d).

Therefore, even assuming Defendants' clients actually told them that they contributed the extremely large amounts of cash and non-cash charitable gifts reported on their tax returns, there are obvious "implications" for such claims. Accordingly, Defendants had a duty to make reasonable inquiries to ensure that they could properly deduct the charitable contributions and "other taxes" at issue. But ultimately, there is no evidence that Defendants' clients documented their entitlement to the deductions claimed on their returns nor that Defendants relied in good faith on any purported representations.

### b. Ignorance of the Tax Code and Honest Mistakes

Defendants' insistence that they made a limited number of mistakes but have since changed their practices is likewise not credible.

As previously addressed, the record evidence strongly supports finding that Defendants recklessly or intentionally understated their clients' tax liability.

Defendants concede that they "made errors in preparing Schedule A itemized deductions" for charitable contributions and medical deductions. ECF No. 24, PageID.1379. Relatedly, Defendant Richmond Simmons confessed to improperly claiming deductions for "other taxes." ECF No. 23, PageID.1358. Indeed, Defendants admit that they "exhibit[ed] a severe misunderstanding of the terms used in the code section [on charitable deductions]." ECF No. 24, PageID.1382. Defendants also acknowledge that they "did not understand key tax concepts." *Id.* at PageID.1379.

But this "severe" ignorance does not excuse Defendants' conduct. In their opposition brief, Defendants themselves highlight 26 C.F.R. § 1.6694-3(c), an IRS regulation stating that "[a] preparer is reckless in not knowing of a rule or regulation if the preparer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable preparer would observe in the situation." ECF No. 16, PageID.520. Yet Defendants argue that they cannot be held liable under § 6694 despite admitting to a "complete lack of knowledge" on some "key tax concepts" and claiming deductions relying on those concepts. ECF No. 24, PageID.1379. In essence, Defendants maintain that blindly filling in

figures for concepts they could not define and claiming deductions they did not understand constitutes a reasonable practice. No reasonable tax preparer would proceed in such a grossly uninformed and willfully ignorant manner.

Therefore, assuming Defendants genuinely did not know how to comply with federal tax laws before holding themselves out as tax professionals and preparing returns, their failure to familiarize themselves with the "key tax concepts" plainly constitutes (at minimum) recklessness in understating their clients' tax liability. *See Stinson*, 729 F. App'x at 896 (finding that the defendant acted "willfully and recklessly" in part because "[d]espite holding himself out as a tax professional, [the defendant] made no attempt to familiarize himself (or his staff) with federal tax law"); *Abdo v. United States*, 234 F. Supp. 2d 553, 560, 564 (M.D.N.C. 2002), *aff'd*, 63 F. App'x 163 (4th Cir. 2003) (finding that the defendant took positions "he knew or had reason to believe" were unreasonable because he held himself out to be a tax professional and the law "attribute[d]" to him a reasonable awareness of the tax code); *United States v. Venie*, 691 F. Supp. 834, 839 (M.D. Pa. 1988) ("In holding himself out to the public as a tax return preparer, [the defendant] is presumed to be familiar with the Internal Revenue Code as well as the regulations and case law regarding the Code.").

### c. Credibility of the Government's Declarants

Lastly, Defendants claim that at least one of the Government's declarants, Kierra Britton, had incentives to lie to Defendants and the IRS about her tax liability. ECF No. 24, PageID.1384–85. Although Defendants have presented evidence to undercut Britton's credibility, the weight of the evidence still strongly supports finding that Defendants willfully and continually violated § 6694. *See Stone*, 2006 WL 2990246, at *1 (denying the defendants' motion for reconsideration that relied on affidavits contradicting four of the Government's declarants because the rebuttal evidence did not undermine the Court's finding that the defendants violated the tax code in numerous other instances).

Therefore, based on the substantial evidence presented, the Government has met its burden to establish a predicate violation of § 6694 and the necessity of a preliminary injunction to prevent future misconduct. *See United States v. Burgess*, No. 16-4011, 2017 WL 373493, at *3 (D.N.J. Jan. 24, 2017) (concluding that injunctive relief under § 7407 was appropriate because the defendant was undeterred by prior IRS sanctions and continually fabricated Schedule A and Schedule C deductions).

### B. Whether the Preliminary Injunction Should Bar Defendants from Serving as Tax Preparers

The Government has met its burden to show that an enumerated provision of § 7407(b)(1)—here, § 6694—has been violated and an injunction is appropriate to prevent recurrence of such conduct. But

pursuant to § 7407(b)(2), the Government is not only seeking an order prohibiting Defendants from engaging in the specific misconduct alleged. Instead, the Government requests a preliminary injunction "prohibiting Defendants from preparing any federal income tax returns." ECF No. 8-1, PageID.125.

If the Court determines that "a tax return preparer has continually or repeatedly engaged in" the relevant misconduct, "and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of [the Internal Revenue Code], the court may enjoin such person from acting as a tax return preparer." 26 U.S.C. § 7407(b)(2).

### 1. Application of the *Gleason* Factors

The Sixth Circuit has adopted six factors to determine "the need for an injunction to prevent future violations" of the tax code:

> (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated.

*Gleason*, 432 F.3d at 684 (quoting *United States v. Est. Pres. Servs.*, 202 F.3d 1093, 1105 (9th Cir. 2000)).

In *United States v. Pope*, the court found that the *Gleason* factors supported issuing a permanent injunction barring the defendants from serving as tax preparers. There, the court described the gravity of harm

26

as "considerable," where an audit of 87 returns showed that 85 returns had understatements amounting to over $460,000 in deficiencies. *Pope*, 2017 WL 5971665, at *9. The *Pope* defendants were also "extensively and directly" involved in preparing the fraudulent returns, and could not "contradict the inescapable conclusion that they were well aware of the false statements made on those returns." *Id.* In addition, the court found the violations to be "pervasive and recurrent, occurring in nearly all of the returns examined by the government," that spanned over a six-year period. *Id.* As to the likelihood of future violations, the *Pope* court gave strong weight to the fact that the defendants were previously held in contempt for violating a preliminary injunction prohibiting them from preparing taxes during the pendency of the case. *Id.*

To assess the likelihood of recurrence under less extreme circumstances, courts have considered "the volume of returns generated and the potentially large amount of understated tax liability" to conclude that the "Defendants' deleterious behavior is all but certain to occur." *Stone*, 2006 WL 2265436, at *3; *see also United States v. Elsass*, 978 F. Supp. 2d 901, 940 (S.D. Ohio 2013), *aff'd*, 769 F.3d 390 (6th Cir. 2014) (highlighting that the defendants' conduct was "in no way isolated, but is instead recurrent in nature, involving hundreds of individual customers, their tax returns, and millions of dollars," making it "highly likely that if they were allowed to continue operating, their customary business activities would again lead them to run afoul of the tax laws").

### 2. The *Gleason* Factors Support Enjoining Defendants from Acting as Tax Preparers

The Government argues that the *Gleason* factors "all support the issuance of a preliminary injunction enjoining any tax return preparation." ECF No. 8-1, PageID.126. Meanwhile, Defendants claim that if the Court is inclined to issue a preliminary injunction, a narrow, conduct-based injunction is sufficient to prevent the recurrence of misconduct. ECF No. 16, PageID.522. Defendants also specifically insist that the Government should not be permitted to "extrapolat[e]" harm from its audit of only 1% of returns filed between 2016 and 2020. *Id.*

The present circumstances closely track those in *Pope* where the court found that the *Gleason* factors merited a permanent injunction barring the defendants from serving as tax preparers. As discussed above, the Government has ample evidence that Defendants have repeatedly engaged in misconduct, beginning from at least 2014 when the IRS first imposed due diligence penalties on them. Moreover, Defendants were extensively involved in tax preparation, such that the understatements are wholly attributable to their conduct. And importantly, the nature of the misconduct suggests that Defendants violated the tax code willfully and have not fully recognized their culpability. *See United States v. McIntyre*, 715 F. Supp. 2d 1003, 1009 (C.D. Cal. 2010) ("Defendants have not merely made a few excusable errors or tried a novel, but arguably reasonable, approach on a few

returns filed at the same time; the above facts describe a significant pattern of willful misconduct.").

Nonetheless, Defendants claim that the audited sample of 131 tax returns between 2016 and 2020 with nearly $550,000 in deficiencies is inadequate to demonstrate substantial harm. In support, Defendants cite only one out-of-circuit case that is factually inapposite. In *United States v. Cruz*, the court noted that "it would not be appropriate to extrapolate a loss to all 4,960 returns" based on the Government's audited sample of 149 returns. 618 F. Supp. 2d 1372, 1390–91 (S.D. Fla. 2008), *aff'd in part, vacated in part, remanded*, 611 F.3d 880 (11th Cir. 2010). But the *Cruz* court also found that "[t]he rate of errors uncovered by the Government's audit of the 149 returns diminished year by year, many of them precipitously." Additionally, "a number of the errors found on the tax returns audited can be explained as simple human error." *Id.* at 1391.

On the other hand, the *Pope* court considered a relatively small sample of 87 audited returns totaling $461,463 in deficiencies to constitute "considerable" harm. 2017 WL 5971665, at *9; *see also Stone*, 2006 WL 2265436, at *3 (relying on audited sample of 125 returns over five years totaling $785,392 in issuing preliminary injunction under § 7407); *Hargrove*, 2017 WL 2198190, at *3 (relying on audited sample of 50 returns from "multiple years" totaling over $200,000 in deficiencies to issue preliminary injunction barring the defendant from acting as a tax preparer). And even if *Cruz* should be considered persuasive in deciding

whether an audited sample sufficiently demonstrates harm, none of the mitigating factors at issue in *Cruz* apply here. Through 77 client interviews, the Government found that both individual Defendants (Herman Simmons and Richmond Simmons) understated liability in 90% of cases. ECF No. 8-1, PageID.113. And the strong indicia of fraud present in returns prepared specifically by Defendant Richmond Simmons demonstrates that these were not simple errors or oversights. Therefore, the weight of authority suggests that the harm here is significant based on the audited sample alone.

The Court also considers Defendants' claims that they have taken steps to correct their previous misconduct. For example, Defendants purport to have "updated their practices to comply with due diligence requirements, cleared their staff and upgraded their recordkeeping." ECF No. 16, PageID.510; Richmond Simmons Decl. (Feb. 3, 2023), ECF No. 16-1, PageID.531. But Defendants admit that they only began making such changes "[s]ince the inception of this case" in August 2022. ECF No. 9, PageID.464. In response, the Government points to many other issues of which Defendants knew or should have known for years, but still have not corrected. Indeed, as thoroughly discussed above, the tax returns filed just before the Court issued its TRO on January 20, 2023 contain the same patterns of fraudulent deductions prevalent in the 2016-2020 returns. And the "substantiation" documents submitted by Defendants contain badges of fraud that further highlight their

culpability. This is evidence of the kind of conduct Defendants committed even after the IRS brought a lawsuit against them alleging fraud.

While Defendants' emphasis on the changes they have made could be considered a sign of some acceptance of responsibility, they maintain that "the actions that have resulted in this suit . . . are believed to be the result of Herman Simmons's failing mental state or poor procedures and document retention due to the COVID-19 pandemic." ECF No. 16, PageID.515. While Herman Simmons's dementia certainly reduces whatever level of culpability he may have, it does not change the fact that the returns prepared by Richmond Simmons also suffered from a 90% error rate. *See* Government's Reply, ECF No. 18, PageID.588 ("[Herman Simmons's] dementia does not explain the fraudulent returns Richmond prepared."). And Richmond Simmons has made clear that he plans to continue working as a tax preparer after severing his father from their business. ECF No. 16, PageID.515.

Furthermore, the Government audited returns between the 2016 and 2020 tax years. Any plausible disruption caused by COVID-19 would have only occurred during the very end of filing for the 2019 tax year and during the 2020 tax year. But as previously noted, Defendants were aware of their inadequate recordkeeping long before the pandemic when the Government imposed due diligence penalties on them in 2014, 2015, and 2017. ECF No. 8-1, PageID.111. Those penalties did not cause

Defendants to implement any changes—nothing was done until after the present suit was filed in August 2022.

Therefore, despite Defendants' contentions that they have changed their ways, the evidence before the Court is sufficient to show that their misconduct has caused considerable harm, was continuous, and is likely to continue through Defendant Richmond Simmons. Although this kind of injunction will deprive Defendants of their ability to make a living as tax preparers, "they have never enjoyed a right to profit from illegal conduct." *Pugh*, 717 F. Supp. 2d at 302; *see also Hargrove*, 2017 WL 2198190, at *2, *5 (noting that the defendant claimed "she has changed her ways or been more careful since learning that she was under investigation by the IRS," and "needs the money she earns as a tax return preparer to support herself and her children," but still recommending a preliminary injunction barring her from acting as a tax preparer).

## C. Whether an Injunction May Be Issued Under 26 U.S.C. § 7402

The Government also argues that it is entitled to an injunction under 26 U.S.C. § 7402(a), a general jurisdictional provision that permits courts to issue injunctions "necessary or appropriate for the enforcement of the internal revenue laws." Defendants incorrectly argue without any substantive support that an injunction under § 7402 must satisfy the traditional four-factor test required for preliminary injunctions issued under Federal Rule of Civil Procedure 65. ECF No. 16, PageID.524. To

the contrary, the Sixth Circuit has made clear that "the traditional requirements for equitable relief need not be satisfied" before issuing an injunction under § 7402. *United States v. ITS Fin., LLC*, 592 F. App'x 387, 400 (6th Cir. 2014). Rather, the Sixth Circuit has approved of applying the *Gleason* factors to assess whether an injunction under § 7402 is "necessary or appropriate," and noted that there are "many cases in which an injunction was issued under § 7402 as well as § 7407." *Id.* Thus, for the same reasons an injunction is appropriate under § 7407, an injunction is also properly issued under § 7402.

## IV.   CONCLUSION

For the foregoing reasons, the Government's motion for a preliminary injunction is **GRANTED**.

The Court enters this preliminary injunction enjoining Defendants, individually and doing business as Simmons Tax, their officers, agents, servants, employees, and attorneys, and anyone in active concert or participation with them, directly or indirectly, from:

1. Preparing or assisting in the preparation or filing of federal tax returns, amended returns, and other federal tax documents and forms for anyone other than themselves;

2. Advising, counseling, or instructing anyone about the preparation of a federal tax return;

3. Owning, managing, controlling, working for, or volunteering for an entity that is in the business of preparing federal tax returns or other federal tax documents or forms for other persons;

4. Providing office space, equipment, or services for, or in any other way facilitating, the work of any person or entity that is in the business of preparing or filing federal tax returns or other federal tax documents or forms for others or representing persons before the IRS;

5. Advertising tax return preparation services through any medium, including print, online, and social media;

6. Maintaining, assigning, transferring, holding, using, or obtaining a Preparer Tax Identification Number (PTIN) or an Electronic Filing Identification Number (EFIN);

7. Representing any person in connection with any matter before the IRS;

8. Employing any person to work as a federal tax return preparer other than to prepare or file the federal tax return of one of the Defendants;

9. Referring any person to a tax preparation firm or a tax return preparer, or otherwise suggesting that a person use any particular tax preparation firm or tax return preparer;

10. Selling, providing access, or otherwise transferring to any person some or all of the proprietary assets of Defendants generated by

their tax return preparation activities, including but not limited to customer lists; and

11. Engaging in any conduct subject to penalty under 26 U.S.C. §§ 6694, and 6695, or that substantially interferes with the administration and enforcement of the internal revenue laws.

This preliminary injunction will remain in place through the resolution of this case on the merits.

**IT IS SO ORDERED.**

Dated: April 10, 2023          s/Terrence G. Berg
                                               TERRENCE G. BERG
                                               UNITED STATES DISTRICT JUDGE